******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

MULLINS, J., with whom D'AURIA, J., joins, concurring. I agree with and join the majority's thoughtful and well reasoned opinion. In particular, I wholeheartedly endorse the majority's decision in part II B of its opinion to create a Jury Selection Task Force to identify and implement corrective measures for combatting the discriminatory use of peremptory challenges beyond the framework set forth in *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). I write separately because, in my view, it is time not only to reconsider the framework of the *Batson* challenge in order to eliminate discrimination in jury selection but also to consider substantially restricting the use of peremptory challenges altogether.

Peremptory challenges by their very nature invite corruption of the judicial process by allowing—almost countenancing—discrimination. The credibility and integrity of our system of justice should not tolerate prospective jurors being prevented from serving on juries on the basis of discrimination due to their race, ethnicity, gender or religious affiliation. The straightest line to eliminating such discrimination would be to eliminate the peremptory challenge. In our state, in light of article first, § 19, of the Connecticut constitution, as amended by article IV of the amendments, outright elimination of the peremptory challenge would raise constitutional concerns. However, nothing in our constitution prevents the next best thing, which would be to substantially reduce the number of peremptory challenges that the parties have available for their use.

I

As the majority opinion cogently sets forth, the *Batson* framework has proven to be wholly inadequate to address the discriminatory use of peremptory challenges. There are, however, more fundamental problems with peremptory challenges that should lead us to question whether any reforms short of reducing the parties' access to peremptory challenges will meaningfully reduce the discriminatory effects that they have on the selection of jurors.

The problem of discrimination in peremptory challenges stems from the following systemic issues: (1) the historical use of peremptory challenges as a means of excluding African-Americans from jury service; (2) peremptory challenges lead inescapably to parties striking prospective jurors on the basis of speculation and stereotypes; (3) peremptory challenges are often based on unconscious biases and justifications that are ostensibly race neutral but that have a disparate impact on minority jurors; and (4) peremptory challenges lead to violations of the constitutional rights not just of the

parties but also of the prospective jurors.

## A

First, peremptory challenges have a history of being used as a tool of racial discrimination. Until *Batson* was decided in 1986, the United States Supreme Court expressly countenanced the use of peremptory challenges to strike jurors on account of their race. See *Swain* v. *Alabama*, 380 U.S. 202, 220–21, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), overruled by *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Emphasizing the inherent conflict between peremptory challenges and equal protection principles, the United States Supreme Court concluded: "[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. . . . To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the [e]qual [p]rotection [c]lause would entail a radical change in the nature and operation of the challenge. The challenge, pro tanto, would no longer be peremptory, each and every challenge being open to examination . . . . And a great many uses of the challenge would be banned."[1] *Swain* v. *Alabama*, supra, 380 U.S. 221–22. Although *Swain* was eventually overruled by *Batson*, this long held understanding, that it was acceptable to strike prospective jurors on the basis of their race, has left an indelible mark on the use of peremptory challenges.

I acknowledge that the problem extends beyond race and into discrimination on the basis of ethnicity, gender, and religious affiliation, which also are entitled to protection under the *Batson* framework. See *J. E. B.* v. *Alabama*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994); *State* v. *Hodge*, 248 Conn. 207, 244–45, 726 A.2d 531 (1999). The *Batson* framework, however, is equally ineffective in addressing discrimination on these bases as well.

## B

Second, peremptory challenges lead inescapably to parties striking prospective jurors purely on the basis of speculation and stereotypes. Unlike challenges for cause, where the prospective juror's partiality is articulable, "the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable." *Swain* v. *Alabama*, supra, 380 U.S. 220. "With limited information and time, and a lack of any reliable way to determine the subtle biases of each prospective juror, attorneys tend to rely heavily on stereotypes and generalizations in deciding how to exercise peremptory challenges." *State* v. *Saintcalle*, 178 Wn. 2d 34, 81, 309 P.3d 326 (2013) (Gonzalez, J., concurring).

It is almost inevitable that this expedient resort to stereotypes will invoke improper racial and other dis-

criminatory considerations. I submit that decisions to exclude a prospective juror on the basis of stereotypes, whether based on racial or other discriminatory considerations that have nothing to do with the juror's ability to fairly assess the evidence and follow legal instructions given by the judge, have no place in our system of selecting jurors.

C

Third, as discussed in the majority opinion, there are two especially elusive problems with peremptory challenges: (1) unconscious or implicit bias; and (2) lines of voir dire questioning that are race neutral but that have a disparate impact on minority jurors. Although these forms of discrimination are not purposeful, their consequences are no less pernicious. Both result in minorities being disproportionately excluded from jury service. This brand of exclusion has the effect of reducing diversity in our juries and perpetuating a mistrust of our justice system, particularly among those in the communities disparately impacted by these challenges. See *State* v. *Holmes*, 176 Conn. App. 156, 197–99, 169 A.3d 264 (2017) (*Lavine, J.*, concurring); *State* v. *Saintcalle*, supra, 178 Wn. 2d 100 (Gonzalez, J., concurring).

Regarding unconscious or implicit bias, Justice Marshall explained in *Batson* that "[a] prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported." *Batson* v. *Kentucky*, supra, 476 U.S. 106 (Marshall, J., concurring).

A number of judges and commentators have argued that the only way to meaningfully combat the effects of implicit bias on peremptory challenges is to limit or eliminate them. See *Rice* v. *Collins*, 546 U.S. 333, 343, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (Breyer, J., concurring) (In suggesting that peremptory challenges should be abolished, Justice Breyer noted that, "sometimes, no one, not even the lawyer herself, can be certain whether a decision to exercise a peremptory challenge rests upon an impermissible racial, religious, gender-based, or ethnic stereotype. . . . How can trial judges second-guess an instinctive judgment the underlying basis for which may be a form of stereotyping invisible even to the prosecutor?" [Citations omitted.]); A. Page, "*Batson*'s Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge," 85 B.U.L. Rev. 155, 246 (2005) ("The psychological research . . . demonstrates the prevalence of unconscious, automatic stereotype use and the difficulty in eradicating it, even among those who are not of a mind to discriminate. This finding provides one more powerful reason to elim-

inate the peremptory challenge.").

The problem of lines of voir dire questioning that have a disparate impact on minorities is equally complex. Our case law, as the majority opinion notes, has held that ostensibly race neutral reasons for striking a juror—such as, in this case, the juror's negative views about law enforcement—pass muster under *Batson* even though they disproportionately affect minority jurors. See *State* v. *King*, 249 Conn. 645, 666–67, 735 A.2d 267 (1999); *State* v. *Hodge*, supra, 248 Conn. 230–31; *State* v. *Smith*, 222 Conn. 1, 13–14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); see also *Hernandez* v. *New York*, 500 U.S. 352, 359–60, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).

Throughout history and continuing through the present day, relations between the police and many minorities and minority communities have been strained and highly contentious. Recently, police killings of African-American men and women have been highly publicized. Unfortunately, while the heightened publicity around these cases is new, these stories are not new. We cannot turn a blind eye to that reality. To permit an honest venireperson who expresses that experience to be prevented from service on a jury is unacceptable.[2] I therefore echo the sentiments of the Appellate Court majority that "permitting the use of peremptory challenges with respect to potential jurors who express negative views toward the police or the justice system may well result in a disproportionate exclusion of minorities from our juries, a deeply troubling result." *State* v. *Holmes*, supra, 176 Conn. App. 181 n.5. Indeed, as Judge Lavine thoughtfully set forth in his concurring opinion in the Appellate Court, the effects of these types of challenges are immensely damaging to our juries and to the perception of our justice system. See id., 197–99 (*Lavine, J.*, concurring).

Adequate solutions to this problem are hard to come by, due in no small part to the innumerable permutations of disparate impact questions. In light of the complexity of these problems, I believe that outright elimination of, or at least a substantial reduction in access to, peremptory challenges is the most effective way to lessen the discrimination that arises from peremptory challenges.

D

Finally, it is important to remember that every time a discriminatory, peremptory strike goes unchallenged or such a strike passes muster in our courts, it violates the equal protection rights not only of the affected parties but also of the individual jurors who were improperly stricken. See *Powers* v. *Ohio*, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (The equal protection clause prohibits prosecutors from "exclud[-ing] otherwise qualified and unbiased persons from the

petit jury solely by reason of their race, a practice that forecloses a significant opportunity to participate in civic life. An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race."). "[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." Id., 407. A procedure that permits qualified jurors to be excluded from jury service because of their race, ethnicity, gender or religious affiliation is irreconcilable with promoting the legitimacy and credibility of our justice system.

In my view, the importance of these rights should lead us to question whether they should be left to self-interested parties who, as previously explained, often are acting on the basis of stereotypical judgments. Citizens should not be deprived of the opportunity to serve on a jury in the absence of an acceptable and identifiable reason. Our system takes that into account with the challenge for cause. The peremptory challenge allows too much discrimination to seep into the decision to strike a prospective juror.

## II

Having identified the systemic problems associated with peremptory challenges, I now consider the constitutional and policy considerations involved in addressing these problems. I acknowledge at the outset that, although there is no right to peremptory challenges under the federal constitution; see *Georgia* v. *McCollum*, 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992); total elimination of peremptory challenges may not be possible in this state. This is because article first, § 19, of the Connecticut constitution was amended in 1972 to include the following provision: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. . . ." Conn. Const., amend. IV.

I make two observations here. First, our constitution does not prescribe any minimum number of peremptory challenges that parties are entitled to; see Conn. Const., amend. IV; leaving that to be determined by the legislature. See General Statutes § 51-241 (providing each party with three peremptory challenges in civil cases, subject to limitations); General Statutes § 54-82g (providing state and defendant each with between three and twenty-five peremptory challenges in criminal cases, depending on severity of crime charged). Thus, there does not appear to be any constitutional impediment to reducing the number of peremptory challenges available to parties.

Second, and more fundamental, although the language of the constitution affords the state a right to a

peremptory challenge, the historical basis for that right is unclear. Historically, peremptory challenges have been recognized, not as a right belonging to the government, but as a tool for criminal defendants to protect themselves *from* the government. Indeed, this court described peremptory challenges several years before they were constitutionalized as "one of the most important rights secured to *the accused* . . . ." (Emphasis added; internal quotation marks omitted.) *DeCarlo* v. *Frame*, 134 Conn. 530, 533, 58 A.2d 846 (1948). This court has recognized peremptory challenges as a means of securing a criminal defendant's right to trial by a fair and impartial jury. See *State* v. *Hodge*, supra, 248 Conn. 217. The United States Supreme Court has explained that the right to a trial by a fair and impartial jury "is granted to criminal defendants in order to prevent oppression by the [g]overnment." *Duncan* v. *Louisiana*, 391 U.S. 145, 155, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

Notwithstanding the fact that article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides that "the parties" in a criminal action have the right to peremptory challenges, granting that right to the state seems incongruous with the other rights associated with criminal trials. Virtually all of the other trial related rights in a criminal case have as their basis the protection of the individual against the state.[3] Nevertheless, I understand that the language of the constitutional provision provides the state with peremptory challenges. However, given that the legal basis for the state's constitutional right to peremptory challenges in a criminal case is certainly open to question, I suggest that it is appropriate to consider whether the state should be entitled to an equal number of peremptory challenges as the accused in a criminal case. Instead, it may be appropriate, in a criminal case, to limit the number of peremptory challenges available to the state in greater measure than the number of peremptory challenges available to the defendant.

Apart from the constitutional question of whether limiting the number of peremptory challenges available to the state to a greater degree than the number available to the defendant would be permissible under our state constitution, there remains the question of whether providing criminal defendants with greater access to peremptory challenges than the state is appropriate as a matter of policy. Justice Marshall, for instance, rejected such disparate treatment in his concurring opinion in *Batson*, reasoning that "[o]ur criminal justice system 'requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.'" *Batson* v. *Kentucky*, supra, 476 U.S. 107 (quoting *Hayes* v. *Missouri*, 120 U.S. 68, 70, 7 S. Ct. 350, 30 L. Ed. 578 [1887]).

Others, however, have argued that, because only criminal defendants possess the constitutional right to a fair trial and impartial jury, their use of peremptory challenges should be preserved while prosecutors' use should be eliminated or reduced. See *Georgia* v. *McCollum*, supra, 505 U.S. 68 (O'Connor, J., dissenting) (arguing that *Batson* prohibition on race based peremptory challenges should not apply to criminal defendants because "[t]he concept that the *government alone* must honor constitutional dictates . . . is a fundamental tenet of our legal order . . . [and] [t]his is particularly so in the context of criminal trials, where we have held the prosecution to uniquely high standards of conduct" [emphasis added]).

These difficult constitutional and policy questions are not presently before this court and I make no attempt to answer them here. Instead, I write separately to emphasize that the problem of racial and other forms of discrimination in the use of peremptory challenges is extremely complex and the solution to the problem must take into account that complexity. To be sure, solutions may need to extend beyond the framework of the *Batson* challenge to encompass a substantial reduction in the availability of peremptory challenges.

[1] In *Swain*, the United States Supreme Court recognized that the use of peremptory challenges to exclude African-American jurors violated the equal protection clause only if there was evidence that the state did so in virtually every single case and that no African-Americans were ever selected to serve on juries. *Swain* v. *Alabama*, supra, 380 U.S. 223–24. This requirement later was recognized as "impos[ing] a crippling burden of proof that left prosecutors' use of peremptories largely immune from constitutional scrutiny." (Internal quotation marks omitted.) *Miller-El* v. *Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).

[2] Judge Lavine, in his concurring opinion in the Appellate Court in this case, provides other examples of experiences that a venireperson of a particular suspect class may honestly reveal that may subject him or her to being stricken from the jury. See *State* v. *Holmes*, supra, 176 Conn. App. 197 (*Lavine, J.*, concurring). I agree with his examples and find it unacceptable for an individual to be excluded from service on a jury merely because he or she has experiences common to his or her race, ethnicity or gender that a party considers to be objectionable for service on a jury.

[3] The right to a jury trial has been deemed fundamental because it safeguards the accused's rights against abuse of state power. See *Duncan* v. *Louisiana*, supra, 391 U.S. 155–56. Likewise, "[t]he right to counsel under the sixth amendment of the federal constitution protects a criminal defendant at critical stages of the proceedings from adversarial government agents . . . ." *State* v. *Piorkowski*, 243 Conn. 205, 215, 700 A.2d 1146 (1997); see also *Gideon* v. *Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (right to counsel is necessary to protect criminal defendants from government, which spends "vast sums of money to establish machinery to try defendants accused of crime"). The same is true of the sixth amendment right to a speedy trial; see *State* v. *Baker*, 164 Conn. 295, 296, 320 A.2d 801 (1973) ("[o]n its face, [the right to a speedy trial] is activated only when a criminal prosecution has begun and extends only to those persons who have been accused in the course of that prosecution" [internal quotation marks omitted]); and the fifth amendment right against self-incrimination. See *In re Samantha C.*, 268 Conn. 614, 634, 847 A.2d 883 (2004) ("fifth amendment privilege against self-incrimination . . . protects the individual against being involuntarily called as a witness against himself" [internal quotation marks omitted]). Similarly, the fourteenth amendment, which forbids the purposeful discrimination in the exercise of peremptory challenges, was designed to protect citizens from state action. See *State* v. *Holliman*, 214 Conn. 38, 43, 570 A.2d 680 (1990) (fourteenth amendment "prohibits the states from denying federal constitutional rights" and "applies to acts

of the states, not to acts of private persons or entities" [internal quotation marks omitted]).

Moreover, article first, §§ 8 and 20, of the Connecticut constitution, which contain our state counterparts to these federal rights, by their express terms extend only to individual citizens or criminal defendants. See Conn. Const., art. I, § 8 (listing rights secured to "the accused" and providing that "[n]o person shall be compelled to give evidence against himself"); Conn. Const., art. I, § 20 ("[n]o person shall be denied the equal protection of the law"). The foregoing demonstrates that both the language and the origins of these trial related rights establish that their purpose is to protect the accused from the awesome power of the state. Conversely, there is no historical basis for the proposition that the state possesses constitutional trial related rights.

───────────────────────────